**HILLHAVEN, INC., Appellant,**

v.

**CARE ONE, INC., Joe Costello, Jewell Care Center, Inc., and T. R. Jewell, Appellees.**

No. 18439.

Court of Civil Appeals of Texas, Fort Worth.

July 23, 1981.

Rehearing Denied Sept. 17, 1981.

Meyers, Miller, Middleton, Weiner & Warren (now Jones, Day, Reavis & Pogue) and David J. White, Dallas, for appellant.

Lastelick, Anderson & Hilliard and James R. Hilliard, Dallas, for appellees Care One, Inc. and Joe Costello.

Crutcher, Hull, Ramsey & Jordan and James S. Pleasant and Vera R. Bangs, Dallas, for appellees Jewell Care Center, Inc. and T. R. Jewell.

## OPINION

HUGHES, Justice.

Hillhaven, Inc., has been enjoined from terminating a lease agreement it had with Care One, Inc., and Joe Costello. Care One and Costello will be referred to collectively as Care One.) Jewell Care Center, Inc. and T. R. Jewell (referred to collectively as Jewell Care Center) are Care One's sublessees and were in possession of the leased premises at the time of trial. The central issue presented here is whether Care One is entitled to an extension of its leasehold estate.

We reverse and render.

Care One initiated this proceeding by filing an original petition seeking to have Hillhaven enjoined from terminating, cancelling and/or forfeiting the lease under which they were at that time holding the premises. Hillhaven agreed to a temporary injunction pending a trial on the merits. The case reached this court after that trial.

Jewell Care Center, as party in possession of the leased premises, filed a petition in intervention and bill of interpleader and made successive deposits of funds into the registry of the court. The deposited funds represented the difference between Jewell Care Center's rental obligation to Care One and Care One's rental obligation to Hillhaven. Attorneys' fees were sought by Jewell Care Center which contended it was a disinterested stakeholder.

Hillhaven answered and afterwards filed a counterclaim and crossaction against Care One and Jewell Care Center in the nature

of trespass to try title for possession, damages, and attorneys' fees.

These facts were stipulated at trial. By an agreement dated July 14, 1976, Hillhaven leased a nursing home facility located in Gainesville, Texas, to Care One for a primary term of ten years commencing August 1, 1976 with certain options for renewal.

On March 18, 1977 Hillhaven sold Care One a nursing home facility in Mt. Pleasant, Texas in consideration of Care One's execution and delivery to Hillhaven of a "first lien real estate note" in the amount of $500,000.00 and a "second lien real estate note" in the amount of $150,000.00. The notes were secured by a deed of trust. The purchase agreement provided that a default in the payment of these notes could be treated by Hillhaven as an event of default under the terms and provisions of the lease of the Gainesville property.

In November 1977 Hillhaven claimed that Care One defaulted in the payment of the notes and sought to foreclose upon the Mt. Pleasant property and to terminate the lease of the Gainesville property.

From this controversy arose a settlement agreement pursuant to which the $500,-000.00 note was discharged through refinancing obtained from a Corsicana bank. Care One executed a $144,196.79 real estate lien note dated February 6, 1978 to Hillhaven in substitution for, but not in discharge of, the $150,000.00 note. This note was secured by a deed of trust. This "new note" was to be paid in $2,000.00 monthly installments until January 31, 1979 when the entire balance of principal and accrued interest would be due and payable.

In further pursuance of settlement, a "new lease", dated January 31, 1978 was executed by Hillhaven and Care One. It provided for an initial term of February 1, 1978 until February 28, 1979. Paragraph 3(a) of the new lease reads as follows:

"Provided that Tenant is not then in default hereunder and provided the Note has then been paid in full including all accrued interest thereon, Tenant shall have an option to extend this Lease for an additional period commencing March 1, 1979 and ending July 31, 1986 (the 'First Extension Period'). Such option shall be exercised by written notice thereof given by Tenant to Owner at least 15 days prior to expiration of the initial term. . . . "

Care One failed to pay the principal balance and the accrued interest on the new note when it became due on January 31, 1979.

On February 12, 1979 Hillhaven received a mailgram from Care One giving notice that, pursuant to paragraph 3(a) of the new lease, they were exercising their option to extend the lease.

Care One made no payment on the new note from January 31, 1979 through February 21, 1979. Care One later sent a check dated February 22, 1979 to Hillhaven in the amount of $136,676.60 representing the unpaid principal and interest which had accrued through February 22, 1979. Hillhaven received the check on February 28, 1979.

The check was presented to the bank on which it was drawn on March 3 or 4, 1979. Care One did not have funds on account sufficient to pay the check from March 3 until March 8.

On March 8, 1979 Hillhaven made two separate demands that Care One pay interest on the note—one for interest from February 23, 1979 through February 28, 1979 and the other for interest from March 1, 1979 through March 8, 1979. By two wire transfers, Care One paid the interest demanded.

By correspondence dated March 8, 1979 Hillhaven advised Care One of its position that there was no effective exercise of the option to renew the new lease and demanded that Care One vacate the premises and deliver possession as of March 31, 1979.

Aside from the facts stipulated to, it was developed at trial that Care One had been conducting negotiations with a company by the name of Medi-Villas over the possible sale of the Mt. Pleasant nursing facility.

Hillhaven was made aware of these negotiations and was told that the funds from the sale would be used to discharge the new note.

The trial court rendered judgment permanently enjoining Hillhaven from taking any action to reenter or repossess the leased premises and/or exercising any default remedies provided under the lease which would have as a basis the failure of Care One to effectively renew the new lease. Eviction based upon ineffective extension was also precluded. A take nothing judgment was rendered on Hillhaven's counterclaim and cross-claim. Jewell Care Center was discharged and was awarded attorneys' fees from the fund on deposit. These attorneys' fees were taxed as costs against Hillhaven. Care One was awarded the fund and was also awarded its attorneys' fees. The trial court entered findings of fact and conclusions of law.

There is no dispute that the lease agreement provides for three conditions for the effective extension of the lease: (1) no existing default under the terms of the lease; (2) full payment of the new note; (3) written notice of extension given to Hillhaven at least fifteen days prior to the expiration of the primary term.

The trial court found that paragraph 3(a) of the new lease was ambiguous and further found that the parties intended that if Care One exercised the option to extend the lease by timely notifying Hillhaven then Care One would enjoy continued possession of the leased premises provided they were not in default under the terms of the lease agreement nor delinquent in the full payment of the new note *at the commencement of the first extension period on March 1, 1979,* i. e., the note payment and absence of default conditions were conditions subsequent.

It is Hillhaven's position that the note payment and "no default" conditions had to be met before the giving of notice would effectively work to extend the lease, i. e., they were conditions precedent.

■ Hillhaven has raised a point of error relating to the trial court's finding of ambiguity. Because paragraph 3(a) is susceptible to two reasonable constructions we overrule the point of error.

Several of Hillhaven's points of error attack the trial court's construction of the lease. In ascertaining the intent of the parties to contract in which the language is fairly susceptible to more than one construction, we must consider not only the language but also the subject matter of the contract and the surrounding circumstances existing when such contract was executed. *Lone Star Gas Co. v. X–Ray Gas Co.,* 139 Tex. 546, 164 S.W.2d 504 (1942).

It should be recalled at this point that it was stipulated that the new lease was the product of a settlement arising from a previous default on the part of Care One.

Looking to the lease agreement and the language employed in paragraph 3(a) we observe that one of the reasonable constructions is that Care One "shall have an option" which would be exercisable by giving written notice thereof at least fifteen days prior to the expiration of the initial term "provided that Tenant is not *then* in default hereunder and provided the Note has *then* been paid in full including all accrued interest thereon, . . . ." (Emphasis ours.)

This testimony was elicited from Joe Costello:

"Q From your discussions with Hillhaven in the settlement, you really knew that it was important to them, didn't you, to have that note paid?

"A The short term lease and the note was a trade-off for me to continue to be in possession of both facilities, for paying the up-charge on Mount Pleasant, to retain control of Gainesville.

"Q Well, in essence, out of that settlement agreement you were on trial for about a year, weren't you, to see whether or not you were going to pay off that note in order to continue your lease of the Gainesville property; isn't that right?

"A I don't think I was on trial. They were assuring themselves, or they were making me pay for subletting Gainesville

with the conditions of the short lease plus the short term of the second lien."

■ Based upon this evidence we hold that the full payment and "no default" provisions of the lease were conditions precedent to effective exercise of the option and extension of the lease. We sustain Hillhaven's points of error on this matter.

■ It being undisputed that the new note was not paid in full at the time notice of intent to extend was given, our inquiry becomes one of whether equity lies to allow Care One to extend the period of the lease. "[I]n the absence of equities an optionee is held to a strict compliance with the terms of the option agreement." *Zeidman v. Davis*, 161 Tex. 496, 342 S.W.2d 555, 558 (1961); *Jones v. Gibbs*, 133 Tex. 627, 130 S.W.2d 265, 271 (1939).

The trial court concluded that: by its acts, words and conduct Hillhaven waived timely performance of the note payment condition set out in paragraph 3(a) of the new lease; by its acts, words and conduct is estopped from exercising any right of forfeiture of the leasehold estate as result of Care One's failure to timely pay the note in question; there are ameliorating facts and circumstances in this case that justify the interposition of equity to grant relief to Care One.

The trial court's conclusions were based on its findings that Hillhaven by its acts, words and conduct acquiesced and consented to Care One's delayed payment of the note in question provided Care One continued its best efforts to close the proposed loan transaction, led Care One to believe that it was cooperating with Care One to effect the closing of the proposed loan transaction, and evidenced an intention not to insist on Care One's timely payment of the note in question.

In support of its position that Hillhaven acquiesced in the failure of timely payment, Care One relied upon this evidence: in August 1978 Care One entered into a contract with Medi-Villas to sell the Mt. Pleasant nursing home; the contract provided that Medi-Villas would arrange a loan to Care One in the sum of $200,000.00 for the specific purpose of providing Care One funds to retire the new note on or before January 31, 1979; at Hillhaven's request a copy of the contract was furnished to Hillhaven in August 1978 and Hillhaven acknowledged receipt thereof; Care One discussed the loan provisions with one of Hillhaven's representatives and Hillhaven returned an "estoppel letter" which verified the current unpaid balance of the new note and agreed to certain terms that Medi-Villas had requested; in January 1979 Costello conversed with a representative of Hillhaven and advised him that he was having difficulty with the loan and that he might not make the January 31 payment; Hillhaven's representative responded by requesting Costello to "get it consummated and to keep him informed as to what the progress was"; on January 25, 1979 Care One's attorney informed one of Hillhaven's representatives that Medi-Villas' attorneys were continuing their review of the loan documents and would be in Dallas during the week of February 5, 1979 to close the loan transaction and Hillhaven's representative replied, "Fine, just keep me posted on where you are"; on February 8, 1979 another one of Hillhaven's representatives called Care One to determine the status of the loan transaction and was advised that as of that date representatives of Medi-Villas had not come to Dallas and Medi-Villas' attorneys indicated that the loan transaction would probably be delayed until the week of February 12, 1979; in that conversation Hillhaven's representatives requested letter notice from the Dallas attorney representing Medi-Villas confirming that the loan was going to close and that funds were earmarked for retirement of the new note—no objection to late payment was made and advisement of progress was requested; Medi-Villas' attorney sent a confirmation letter to Hillhaven and advised Hillhaven that closing was anticipated during the early part of the week of February 12, 1979; on February 14, 1979 Care One contacted Hillhaven to advise them that continued review by Medi-Villas' representatives was being conducted and that due to

the delays, alternate arrangements had been made to secure necessary funds by a line of credit from a Frankston bank if the loan transaction did not close prior to the expiration of the initial term of the lease; no objection to the delay was made; Hillhaven sent a letter dated February 16, 1979 to Hexter-Fair Title Company forwarding an executed release of lien form in order "to affect the financing to allow the Note to be paid off," in the event of closing and requesting that, if the loan transaction was closed through the title company, the proceeds be wired to Hillhaven's bank.

Hillhaven's representatives do not recall some of the conversations testified to by Care One's witnesses. Hillhaven introduced two letters (dated January 25, 1979 and February 16, 1979) which, Hillhaven argues, clearly indicated its position that the note was due on January 31, 1979. Hillhaven argues that the statements supposedly made by its representatives were non-committal and must be considered in light of these two letters.

It must be considered that Hillhaven desired and had an unquestioned right to receive full payment on the new note. There is no evidence that Hillhaven and Care One ever discussed extension of the lease and the relation of the payment of the note thereto.

■ The issue becomes one of whether Care One could justifiably rely upon Hillhaven's expressions of interest in the ultimate receipt of the payment to which it was entitled as a waiver by Hillhaven of insistence upon strict compliance with the full payment provision as a condition precedent to effective exercise of the option to renew the lease.

Paragraph 51 of the new lease provides as follows:

"The failure of either party to insist upon strict performance of any of the covenants, agreements, terms and conditions of this Lease or to exercise any option conferred herein in any one or more instances shall not be construed to be a waiver or relinquishment of any such covenant, agreement, term, condition or option and the same shall be and remain in full force and effect."

Considering that Hillhaven did nothing more than express interest in the receipt of the payment to which it was entitled, and the obvious intent of the parties that waiver be avoided, we hold that this is not a proper case for the interposition of equity; thus, strict compliance with the conditions precedent was not excused and Care One is not entitled to an extension of the lease.

We sustain Hillhaven's points of error relating to the trial court's error in interposing equity.

■ We also sustain Hillhaven's point of error which asserts that the trial court erred in awarding Care One its attorneys' fees and in not awarding Hillhaven its attorneys' fees. At trial Care One and Hillhaven stipulated between themselves as to what amount would constitute reasonable attorneys' fees for either party. We hold that Hillhaven instead of Care One is entitled to the attorneys' fees stipulated by the parties.

Hillhaven also asserts that the trial court erred in awarding Jewell Care Center attorneys' fees out of the deposit in the registry of the court instead of against Care One.

All of the parties entered into stipulations which constituted Jewell Care Center a disinterested stakeholder who in good faith deposited funds into the registry of the court.

■ As between rival claimants the burden of paying the interpleader's attorneys' fees as costs falls upon the unsuccessful claimant whose contentions rendered the interpleader necessary. *Bentley v. Grewing*, 613 S.W.2d 49 (Tex.Civ.App.—Fort Worth 1981, writ ref'd n. r. e.). Thus the trial court did not err in awarding Jewell Care Center its attorneys' fees from the fund; however, in light of the judgment rendered by this court we hold that there was error in taxing the costs against Hillhaven. Care One is the party against whom the costs should have been taxed.

We have effectively disposed of all of the points of error.

The judgment of the trial court is reversed and judgment is rendered that the injunction rendered by the trial court be vacated. Hillhaven shall recover the funds deposited into the registry of the court. Hillhaven shall recover its attorneys' fees from Care One in the amounts stipulated by the parties, and the costs of litigation are taxed against Care One.

Reversed and rendered.